NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MELANIE L.,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No. 25-16698 (RK)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court on Melanie L.'s[1] ("Melanie" or "Plaintiff") appeal from the Commissioner of the Social Security Administration's (the "Commissioner") final decision denying Melanie's request for disability insurance benefits. (ECF No. 1.) The Court has jurisdiction to review this appeal under 42 U.S.C. § 405(g) and reaches its decision without oral argument under Local Civil Rule 78.1. For the reasons below, the Court **VACATES** and **REMANDS** the Commissioner's decision for further proceedings.

## I. BACKGROUND

In this appeal, the Court must answer the following question: Did Administrative Law Judge Karen Shelton ("the ALJ" or "Judge Shelton") properly analyze, with substantial evidence, Melanie's residual functional capacity ("RFC") under the Social Security Act?

### A. PROCEDURAL POSTURE

On June 30, 2022, Melanie filed an application for a period of disability, disability insurance benefits, and supplemental security income, alleging an onset date of July 31, 2021.

[1] The Court identifies Plaintiff by first name and last initial only. *See* D.N.J. Standing Order 2021-10.

(Administrative Record ("AR") at 92–93.)[2] Melanie was 41 years old as of her alleged onset date and 42 years old when she filed her application. (*Id.* at 92.) The Social Security Administration (the "Administration") denied the requests both initially, (*id.* at 92–111, 137–46), and on reconsideration, (*id.* at 112–31, 150–57). Thereafter, Melanie requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 158–60.) On June 4, 2024, Melanie, who was represented by counsel, and Rocco J. Meola, a Vocational Expert ("VE"), testified at a hearing before Judge Shelton. (*Id.* at 61–91.) On September 17, 2024, Judge Shelton issued a written decision finding Melanie not disabled. (*Id.* at 41–52.) The Administration's Appeals Council denied Melanie's request to review Judge Shelton's decision. (*Id.* at 1–6.) This appeal followed. (ECF No. 1.) The Administrative Record was filed on January 30, 2026. (ECF No. 5.) Melanie then filed her moving brief, ("Pl. Br.," ECF No. 10), the Commissioner filed an opposition, ("Opp.," ECF No. 12), and Melanie replied, ("Reply," ECF No. 15).

### B. JUDGE SHELTON'S DECISION

As stated in her September 17, 2024 decision, Judge Shelton held that Melanie was not disabled under the prevailing Administration regulations. (*See generally* AR at 41–52.) To reach this conclusion, Judge Shelton analyzed Melanie's application under the five-step process for determining whether an individual is disabled, as set forth in 20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and 416.920(a)(4)(i)–(v).[3]

[2] The Administrative Record ("AR") is docketed at ECF Nos. 5-1 through 5-11. This Opinion will reference only page numbers in the record without the corresponding ECF numbers.

[3] "Although they are governed by separate regulatory schemes, applications for disability insurance benefits and supplemental security income are processed using an identical five-step sequential analysis." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 n.3 (3d Cir. 2004).

At Step One, Judge Shelton found that Melanie had not engaged in substantial gainful activity since July 31, 2021, her alleged onset date. (AR at 44 (citing 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.).)

At Step Two, Judge Shelton found that Melanie suffers from five severe impairments: depressive/bipolar disorder, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), obesity, and "a gastrointestinal disorder comprised of Crohn's disease and gastroesophageal reflux disease" ("GERD"). (*Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).) Judge Shelton concluded that these severe impairments "significantly limit" Melanie's ability to perform basic work activities. (*Id.* (citing SSR 85-28, 1985 WL 56856 (Jan. 1, 1985)).) Judge Shelton also found that Melanie has non-severe impairments of joint pain and dissociative disorder but that, based on the medical evidence, neither impairment results in a "more than minimal limitation in [Melanie's] ability to perform basic work activities." (*Id.*)

At Step Three, Judge Shelton determined that Melanie did not have "an impairment or combination of impairments" that qualifies under the Administration's listed impairments, set out in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (*Id.* at 45 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).) She considered, but found inapplicable, Listing 5.06, "inflammatory bowel disease," Listing 12.04, "depressive, bipolar[,] and related disorders," and Listing 12.15, "trauma- and stressor-related disorders." (*Id.*)[4]

---

[4] Judge Shelton found Listing 5.06 not satisfied because the record does not include "an endoscopy, biopsy, imaging, or operative findings documenting inflammatory bowel disease." (AR at 45.) With respect to Listings 12.04 and 12.15, Judge Shelton found that Melanie failed to satisfy the criteria set forth in "paragraph B" or "paragraph C." (*Id.*); *see* Listing 12.00(A)(2) (explaining that, to satisfy Listing 12.04 or 12.15, a claimant must satisfy the requirements of either paragraph B or C, which respectively relate to the functional limitations caused by the impairment and the seriousness and persistence of the impairment). "Paragraph B" requires one "extreme" or two "marked" limitations in four areas of mental functioning, and Judge Shelton found that Melanie was no more than moderately limited in each area. (AR at 45–46 (finding

As a precursor to Step Four, Judge Shelton concluded, based on a review of the evidence in the record, that Melanie has the RFC to perform "sedentary" work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(a), but that any job she performs should be limited in specified ways:

> [Melanie] can: lift/carry ten pounds occasionally and less than ten pounds frequently; sit approximately six hours and stand/walk no more than two hours in an eight-hour day; never crawl or climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, stoop, kneel, and crouch; frequently handle and finger; understand, remember, and carry out simple, repetitive tasks in a routine environment with few changes; work for two hours before needing a standard fifteen minute break; and frequently interact with supervisors and co-workers in proximity but never have contact with the public, being best suited for work with objects rather than people.

(AR at 46.) In making this RFC finding, the ALJ considered Melanie's subjective statements, the objective medical evidence and other medical evidence, and the medical opinions and prior administrative medical findings ("PAMFs") in the record, summarized below. (*Id.* at 46–50.)

At Step Four, Judge Shelton concluded that Melanie is unable to perform her past relevant work as a waitress, whether "as actually or generally performed." (*Id.* at 50 (citing 20 C.F.R. §§ 404.1565, 416.965).) Before turning to Step Five, the ALJ noted that Melanie was 41 years old on her alleged disability onset date, that Melanie has at least a high school education, and that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (*Id.* at 51 (citing 20 C.F.R. §§ 404.1563, 404.1564, 416.963, 416.964; SSR 82-41, 1982 WL 31389 (Jan. 1, 1982); 20 C.F.R. Part 404, Subpart P, Appendix 2).)

---

Melanie mildly limited in *understanding, remembering, or applying information* and *adapting or managing oneself* and moderately limited in *interacting with others* and *concentrating, persisting, or maintaining pace*).) Judge Shelton found the "paragraph C" criteria not satisfied because "[t]here is no indication in the record that [Melanie] is receiving ongoing treatment or mental health therapy in a highly structured setting." (*Id.* at 46.) Melanie does not challenge Judge Shelton's Step Three conclusions.

Finally, at Step Five, Judge Shelton found that, given Melanie's RFC, age, education, and work experience, "there are jobs that exist in significant numbers in the national economy that [Melanie] can perform," including table worker, scale operator, and final assembler. (*Id.* at 51–52 (citing 20 C.F.R. §§ 404.1569, 404.1569a, 416.969, 416.969a); *see id.* at 51 (noting that these are "representative occupations").) Judge Shelton accordingly concluded that Melanie was not under a disability from her alleged onset date of July 31, 2021, through the date of the decision. (*Id.* at 52 (citing 20 C.F.R. §§ 404.1520(g), 416.920(g)).)

1. <u>Melanie's Reported Symptoms</u>

In making her RFC determination, Judge Shelton concluded that Melanie's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 47.) This appeal concerns both Melanie's physical and mental impairment symptoms, so the Court will briefly summarize the corresponding portions of Judge Shelton's decision.

With respect to Melanie's physical impairments, Judge Shelton considered Melanie's testimony that she is "unable to work because her gastrointestinal disorder requires frequent trips to the bathroom, as often as 25 times per day on a bad day," and has "periods of diarrhea that can last for several days and periods of constipation that can last for several days." (*Id.* (citing AR at 72–74, 80–81).) Judge Shelton then turned to Melanie's medical records, noting that, in 2021, Melanie's primary care provider "repeatedly" noted that Melanie's "abdomen was soft and non-tender" upon examination. (*Id.* at 49 (citing AR at 696, 705, 709, 713).) When Melanie "sought treatment . . . for Crohn's disease, constipation, and [GERD]" in August and October of 2022, and for "Crohn's disease and [GERD]" in June of 2023, her gastroenterologist similarly noted

"relatively normal" examination findings of "a non-tender abdomen and soft, positive bowel sounds." (*Id.* (citing AR at 1500–22).) An MRI in October of 2022 showed "a stable right adrenal mass," a cyst that "was likely ovarian," and that Melanie "was status post ileocecectomy," i.e., that Melanie had previously had part of her colon surgically removed. (*Id.* (citing AR at 1122, 1548); *see id.* at 1403 (medical record noting that Melanie's ileocecectomy was "for Crohn's").) The MRI "did not indicate evidence of bowel obstruction or abnormal bowel thickening or enhancement . . . [or] significant inflammation of her bowel." (*Id.* (citing AR at 1122, 1548).)

In September of 2023, Melanie had a colonoscopy, which "found no evidence of active idiopathic inflammatory bowel disease."[5] (*Id.* (citing AR at 1545).) In January of 2024, Melanie's gastroenterologist "again not[ed] that [Melanie's] abdomen was non-tender and she had soft, positive bowel sounds," and in May of 2024, Melanie's physical examination findings were "unremarkable."[6] (*Id.* at 50 (citing AR at 1342, 1381–88).) Judge Shelton summarized that Melanie's gastroenterologist "treated [her] gastrointestinal disorders with medication management and recommended lifestyle changes due to her [GERD] and obesity." (*Id.* (citing AR at 1342–43).) "Based on the foregoing," Judge Shelton found that Melanie's "gastrointestinal disorder is

[5] Notwithstanding the colonoscopy finding of "no evidence of active idiopathic inflammatory bowel disease," the Court notes that Melanie's gastroenterologist ordered the colonoscopy based on, *inter alia*, Melanie's Crohn's disease "of both small and large intestine with complication," "abnormal" weight gain, and "more lower abd[omen] cramps." (AR at 1500–03.)

[6] These same records reflect that in January of 2024 Melanie reported rectal bleeding and pain, "worsening constipation and cramps," and "intractable" GERD symptoms. (AR at 1342.) The May 2024 appointment (which showed "unremarkable" physical exam findings, per Judge Shelton's summary) was conducted via telehealth, and Melanie's gastroenterologist ordered various tests and scans based on Melanie's symptoms such as swollen legs and feet, face and body rashes, and rapid weight gain. (*Id.* at 1381–88.)

controlled with medication management and her history of conservative treatment during the period at issue."[7] (*Id.* (citing AR at 1330–50, 1381–88, 1500–22, 1528–50).)

Judge Shelton also considered Melanie's statements regarding the symptoms of her mental impairments, including that she "handles stress and changes in routine very poorly," "can only pay attention for five to ten minutes and does not finish what she starts," and "has nightmares and insomnia." (*Id.* at 47 (citing AR at 371, 375–76).) Judge Shelton found such statements and mental health symptoms "inconsistent with years of relatively normal mental status examinations and conservative outpatient treatment." (*Id.*) She first noted that in May of 2021, two months before Melanie's alleged onset date, a depression screening "indicated minimal symptoms of depression."[8] (*Id.* (citing AR at 715).) The ALJ then turned to the medical records from the relevant period, beginning with Melanie's September 7, 2021 visit to the emergency department. (*Id.* (citing AR at 620–50).) As explained hereinbelow, although Judge Shelton described this treatment and the surrounding treatment in September and October of 2021 as "substance use treatment," (*id.* at 47–48), it was also for Melanie's non-substance-use mental illnesses. Judge Shelton stated that Melanie was treated in the emergency department, then discharged and "voluntarily admitted for inpatient substance use treatment," during which she "took medication

---

[7] In evaluating Melanie's physical impairment symptoms, Judge Shelton considered the PAMFs but found them unpersuasive. (AR at 50 (citing AR at 98, 118).) Both state agency consultants opined that Melanie "retained the capacity for light work" but "could never crawl and could only occasionally crouch, kneel, and climb ladders, ropes, scaffolds, ramps and stairs." (*Id.*) Judge Shelton found these opinions "unsupported by personal examinations of the claimant and generally inconsistent with the evidence discussed above to the extent that they understate the claimant's limitations." (*Id.*) She agreed that Melanie can never crawl and can occasionally crouch, kneel, and climb ramps and stairs but additionally found that Melanie could never climb ladders, ropes, or scaffolds and could perform only sedentary, not light, work. (*Id.* at 46.) These persuasiveness determinations are not at issue on appeal.

[8] At the same appointment showing "minimal symptoms of depression," (AR at 47), Melanie reported "'strange things' . . . happening to her lately," including that she was "possibly abducted in Florida for a period of 24 hours & in that period her Facebook site was hacked into," "felt she was under surveillance," and hit a pole with her car "in broad daylight" and "ha[d] no recall of the event," (*id.* at 712). Her provider "urged" her "to seek counseling for all of these events in order to [e]nsure that they aren't paranoia." (*Id.*)

as prescribed, her mood gradually improved, and she was deemed stable for discharge." (*Id.* (citing AR at 620–75).) Melanie was then "admitted to a partial hospitalization program to treat her substance use disorder and provided with medication management." (*Id.* at 48 (citing AR at 741, 758, 775, 782, 788).) Judge Shelton described Melanie's mental status examination upon admission as "relatively normal, other than an anxious mood, impulsive reasoning, and impaired insight," and summarized subsequent mental status examinations in September and October of 2021 as "generally indicat[ing] a depressed, sad, or anxious mood, poor to fair judgment, impaired or limited insight, and tearful behavior." (*Id.* (citing AR at 739, 756, 759, 762, 770, 774, 780, 783, 787).)

After "this substance use treatment," Judge Shelton explained that Melanie "participated in years of outpatient mental health therapy[,] and her symptoms have been managed with medication." (*Id.* (citing AR at 1570–1719).) Judge Shelton summarized Melanie's mental status examinations in 2021, 2022, 2023, and 2024 as "relatively normal," with Melanie exhibiting "cooperative behavior," "logical thinking," and "no signs of hallucinations or delusions," although "her psychiatrist consistently observed her short attention span." (*Id.* (citing AR at 1570–1719).) She added that a psychiatric consultative examination was performed on February 9, 2023, during which the examiner "noted [Melanie's] depressed mood and that she cried throughout the examination." (*Id.* (citing AR at 1128–31); *see also id.* at 1130 (psychiatric consultative examination stating that, if Melanie's application for disability benefits were granted, a third party should manage her funds for her).) Also in February of 2023, "[s]creening[s] . . . indicated severe anxiety but minimal depression." (*Id.* at 48 (citing AR at 1154, 1160).) Judge Shelton also noted that Melanie "began seeing a therapist in October of 2023 for symptoms including nightmares, episodes of dissociation, anxiety, mood disturbance, and concentration difficulties." (*Id.* (citing

AR at 1261, 1351); *see also id.* at 1128–31 (Melanie's former therapist stating that Melanie attended psychotherapy twice a week from August 11, 2017 to September 2, 2021).)[9]

## II. LEGAL STANDARD

### A. STANDARD OF REVIEW

The Court reviews the "final decision of the Commissioner of Social Security" to determine whether the Commissioner's findings are "supported by substantial evidence." 42 U.S.C. § 405(g). If the Appeals Council denies a claimant's request for review, "the ALJ's decision is the Commissioner's final decision." *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Put differently, "[i]t means such relevant evidence as a

---

[9] Judge Shelton also considered the opinion of Melanie's former treating therapist and the PAMFs pertaining to Melanie's mental impairment symptoms. (AR at 49.) Melanie challenges the former evaluation, but the Court does not address that argument for the reasons explained herein. The Court will, however, summarize Judge Shelton's consideration of these opinions.

Melanie's former therapist, Mary-Breen O'Connor, MSW, LCSW, provided a four-page narrative letter "based on years of personally treating [Melanie]." (*Id.* at 49, 1523–26.) The therapist treated Melanie for "oscillating moods ranging from intense depression, overwhelming anxiety, periods of intense rage, and hypomania" as well as "social isolation, frequent crying spells, difficulty completing tasks, aggression, panic attacks, and paranoid thinking." (*Id.* at 49 (citing AR at 1523–26).) She opined, per Judge Shelton's summary, that Melanie had "market deficits completing activities of daily living such as cooking, showering, grooming, and shopping," had difficulty concentrating and remaining focused, and "was unable to maintain past work due to the variability of her mood and difficulty concentrating." (*Id.*) Judge Shelton found Therapist O'Connor's "conclusory" opinion supported by her personal treatment of Melanie but "generally inconsistent with the evidence documenting years of unremarkable mental status examinations" and with Melanie's "history of conservative outpatient treatment consisting of medication management and some therapy." (*Id.* (citing AR at 1378, 1570–1719).) Judge Shelton found the opinion unpersuasive. (*Id.*)

In contrast, Judge Shelton found the PAMFs of record persuasive. (*Id.* (citing AR at 96, 116).) Both state agency consultants opined that Melanie was moderately limited in *interacting with others* and *concentrating, persisting, and maintaining pace* and mildly limited in *understanding, remembering, and applying information* and *adapting and managing herself*. (*Id.*) Although the PAMFs were "unsupported by personal examinations of [Melanie]," Judge Shelton found them "generally consistent with the evidence discussed above." (*Id.*) The Court notes that Melanie argues that the PAMFs "did not reflect consideration of the majority of the evidence of record," as the state agency consultants based their opinions on "17 exhibits in the record" but "*36 new exhibits* of over *300 pages*" were added thereafter. (Reply at 20–21.)

reasonable mind might accept as adequate to support a conclusion." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 633 (3d Cir. 2010) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003)). This evidentiary threshold "is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

The scope of the Court's review of the ALJ's decision is "quite limited." *Rutherford*, 399 F.3d at 552. On review, the Court may not "re-weigh the evidence or impose [its] own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001). The Court must "review the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak,* 777 F.3d at 610 (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999)). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981) (citation omitted).

"Remand is appropriate . . . if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings" or "if the ALJ's findings are not the product of a complete review which 'explicitly weigh[s] all relevant, probative and available evidence' in the record." *David S. v. Bisignano*, No. 23-22339, 2025 WL 2709407, at *3 (D.N.J. Sept. 23, 2025) (alteration in original) (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *see also Zuschlag v. Comm'r of Soc. Sec.*, No. 18-1949, 2020 WL 5525578, at *8 (D.N.J. Sept. 15, 2020) ("On remand, the ALJ may reach the same conclusion, but it must be based on a proper foundation.").

### B. Establishing Eligibility for Disability Insurance Benefits and Supplemental Security Income

A claimant may establish disability under the Social Security Act by proving they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applies a well-established "five-step sequential evaluation process," which requires considering whether the claimant:

> (1) is engaged in substantial gainful activity; (2) suffers from an impairment or combination of impairments that is "severe"; (3) suffers from an impairment or combination of impairments that meets or equals a listed impairment; (4) is able to perform his or him past relevant work; and (5) is able to perform work existing in significant numbers in the national economy.

*McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f)). The claimant bears the burden of proof at the first four steps, at which point it shifts to the Commissioner at Step Five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019).

## III. DISCUSSION

To support her request for remand under 42 U.S.C. § 405(g), Melanie challenges Judge Shelton's RFC determination at the precursor to Step Four. (Pl. Br. at 14–45.) She argues that Judge Shelton (1) failed to properly evaluate the impact of her Crohn's disease on her ability to work, specifically by improperly discounting her subjective statements regarding her bathroom break needs and reaching an unsupported, unexplained off-task formulation; (2) failed to properly account for her reported mental illness symptoms, specifically by mischaracterizing the relevant evidence and "fail[ing] to address the regulatory factors" under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); and (3) "failed to consider the record as a whole in evaluating the opinions of" her

former treating therapist. (*Id.*) For the following reasons, the Court agrees that Judge Shelton did not adequately explain or support her RFC finding that Melanie is capable of "work[ing] for two hours before needing a standard fifteen minute break" or her findings that Melanie's reported bathroom break needs and mental illness symptoms were inconsistent with the record. (AR at 46; *see id.* at 46–50.) Because the Court finds remand warranted on these grounds, it does not address Melanie's other arguments. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003).

### A. RFC Limitations Related to Crohn's Disease

At Step Two of her analysis, Judge Shelton concluded that Plaintiff's "gastrointestinal disorder comprised of Crohn's disease and gastroesophageal reflux disease" is a severe impairment. (AR at 44.) By definition, a severe impairment "has more than a minimal effect on [an individual's] ability to do basic work activities." SSR 96-8P, 1996 WL 374184, at *2 (July 2, 1996); *see* SSR 85-28, 1985 WL 56856, at *3. Likewise, as part of her RFC determination at the precursor to Step Four, Judge Shelton acknowledged Melanie's reported symptoms—including that Melanie stated she "requires frequent trips to the bathroom, as often as 25 times per day on a bad day" and "has periods of diarrhea that can last for several days"—and noted Melanie's treatment throughout the relevant period for Crohn's disease and associated symptoms.[10] (AR at 47, 49–50.) Judge Shelton went on to credit Melanie's "allegations regarding episodes of diarrhea" in finding that Melanie required some amount of off-task time or break time as part of her RFC. (*Id.* at 50.) She further concluded that Melanie's reported symptoms are not as intense, persistent, and limiting as alleged, that the record reflects that "[Melanie's] gastrointestinal disorder is controlled with medication management and her history of conservative treatment during the

[10] The Court observes that Plaintiff's self-serving representation of bathroom frequency up to 25 times per day does not appear to be corroborated in any of the litany of medical records. *See also infra* note 15.

period at issue," and that one fifteen-minute break every two hours is sufficient to accommodate Melanie's symptoms. (*Id.* at 46–47, 50.)

Melanie challenges these findings. She argues that Judge Shelton erred in evaluating the impact of her Crohn's disease on her ability to work and failed to formulate an RFC that adequately accounted for her frequent, unpredictable need for bathroom breaks. (Pl. Br. at 14–21; Reply at 5–9.) She reiterates her reported symptoms—including that, due to chronic diarrhea, she regularly needs to use the bathroom "about 15 to 20 times" a day, or "up to 20 to 25 times" on "bad days," and experiences "emergencies" where she is "running to the bathroom" about five days a week[11]—and points to record evidence of her continuous treatment for Crohn's disease, GERD, and irritable bowel syndrome over the past decade, including during the relevant period. (Pl. Br. at 16–19 (citing AR at 72–75, 623, 630, 696–729, 901, 934, 972, 1073–83, 1139–64, 1170–1247, 1295–1312, 1333–50, 1408–35, 1500–22, 1528–49, 1551–52).) Melanie in turn argues that, while Judge Shelton purported to credit her stated restroom usage and related symptoms by including an RFC requirement for breaks or off-task time, the ALJ neither substantially supported nor adequately explained her specific break formulation and her conclusion that Melanie's greater stated needs were not credible. (*Id.* at 19–21; Reply 5–9.) For the following reasons, the Court agrees.

1. <u>Break Time Formulation</u>

The Court begins with Judge Shelton's specific break time formulation of one fifteen-minute break every two hours. Even assuming, *arguendo*, that Judge Shelton properly concluded

[11] Melanie also noted alternating constipation and diarrhea, although "[m]ost of the time she has diarrhea." (Pl. Br. at 16 (citing AR at 74); AR at 47.) The Court notes that periods of constipation during which a plaintiff with Crohn's disease does not experience the same frequency or urgency surrounding bathroom breaks does not preclude or contradict a bathroom-break RFC limitation. *See David S.*, 2025 WL 2709407, at *5–9; SSR 96-8p, 1996 WL 374184, at *1; *see also* Listings 5.00D(1) (providing that "[r]emissions and exacerbations of variable duration are the hallmark" of inflammatory bowel diseases like Crohn's disease), 5.00E(1) (same, per Listings effective July 23–August 1, 2021, i.e., as of Plaintiff's alleged onset date).

Melanie did not require the frequency or duration of bathroom breaks she alleged—a conclusion the Court addresses *infra*—the ALJ must adequately explain and support the bathroom break and off-task time she decided upon as part of Melanie's RFC.

As with all RFC findings, an ALJ's determination of the extent of a claimant's need for bathroom breaks and off-task time must be supported by substantial evidence and "accompanied by a clear and satisfactory explication of the basis on which it rests." *Benjamin G. v. Bisignano*, No. 25-1797, 2026 WL 526384, at *13 (E.D. Pa. Feb. 25, 2026) (quoting *Cotter*, 642 F.2d at 704). The ALJ must demonstrate why she chose a given limitation, such as a fifteen-minute break every two hours, as here, "'rather than some other duration and frequency,' particularly when 'there is evidence in the record to the contrary.'" *Amber W. v. Comm'r of Soc. Sec.*, No. 25-10250, 2026 WL 822461, at *8 (D.N.J. Mar. 25, 2026) (quoting *Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014)); *see McNeely v. Saul*, No. 20-158, 2020 WL 5648214, at *8 (S.D. W. Va. Sept. 4, 2020) ("While an ALJ is not obligated to base each conclusion in the RFC assessment on a specific piece of evidence, . . . it is impossible for the reviewing Court to determine if the ALJ's [off-task] assessment . . . is supported by substantial evidence without knowing the basis for the figure."), *report and recommendation adopted*, 2020 WL 5649483 (S.D. W. Va. Sept. 22, 2020). The omission of a "meaningful discussion regarding off-task time . . . related to the plaintiff's IBS and restroom needs deprives the Court of the ability to conduct meaningful review," and courts routinely find that "remand is necessary when an ALJ fails to include appropriate restrictions in a claimant's RFC where the evidence demonstrates a need for frequent restroom breaks." *Russell v. Dudek*, No. 24-350, 2025 WL 1257972, at *9 (M.D. Pa. Apr. 30, 2025) (collecting cases); *see David S.*, 2025 WL 2709407, at *8 (collecting cases); *see also Cotter*, 642 F.2d at 705 (explaining that, absent an indication of "the evidence [the ALJ] considered which supports the result" as well

as "the evidence which was rejected," "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored"). In short, where an ALJ "assesse[s] a specific off-task limitation," she is "obligated to explain it, particularly because of its impact on the ultimate determination of disability." *McNeely*, 2020 WL 5648214, at *10.

Judge Shelton provided no specific analysis or basis for her RFC finding that Melanie requires one fifteen-minute break every two hours as opposed to some other amount of off-task or bathroom break time. Despite acknowledging the severity of Melanie's "gastrointestinal disorder comprised of Crohn's disease and gastroesophageal reflux disease" and concluding that such impairments "significantly limit" Melanie's ability to "perform basic work activities," (AR at 44), Judge Shelton's only reference to the amount of break time Melanie would need during the day was her conclusion that Melanie's "allegations regarding episodes of diarrhea" contribute to her "need for 15-minute breaks every two hours," (*id.* at 50).[12] The ALJ did not bridge the gap between the two.

At most, Judge Shelton appears to merely *discredit* Melanie's offered evidence of her frequent bathroom visits. (*See id.* at 47, 50.) However, discrediting Melanie's claimed symptoms is not *affirmative* evidence in support of Judge Shelton's break time formulation, and Judge Shelton pointed to no record evidence in support of her determination that one fifteen-minute break every two hours was the appropriate amount of break time in light of Melanie's impairments and symptoms. *See David S.*, 2025 WL 2709407, at *8 (remanding after finding that the ALJ's

[12] The Court notes that Judge Shelton cites "[t]estimony" from the administrative hearing in support of her conclusion that Melanie's "allegations regarding episodes of diarrhea" contribute to her "need for 15-minute breaks every two hours." (AR at 50 ("[H]er allegations regarding episodes of diarrhea and her mental health symptoms reveal the need for 15-minute breaks every two hours (Testimony).").) The Court understands this citation as relating only to Melanie's "allegations regarding episodes of diarrhea," given that none of Melanie's testimony supports the fifteen-minute figure itself. (*See id.* at 72–74, 80–82.)

determination that the "the claimant can work for 2 hours before needing a standard 15-minute break" constituted "no accommodation for limitations flowing from Plaintiff's Crohn's disease"); *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017) (remanding where "ALJ made no effort to build an accurate and logical bridge between the 'no more than 10%' [off-task] finding and [evidence in the record]'"); *McNeely*, 2020 WL 5648214, at *8 ("[W]hile the ALJ's foregoing explanation provided some insight into the impairments that caused Claimant to be off-task, the ALJ did not discuss or provide any support for his determination that Claimant would be off-task precisely 'less than 9% of the workday.'"); *Richardson v. Saul*, No. 19-128, 2020 WL 3816317, at *6 (E.D.N.C. June 9, 2020) ("[The ALJ] found that [Plaintiff] would be off-task due to pain and medication side effects. While this explains why she would be off-task, it does nothing to inform a reviewing court of how [the ALJ] arrived at the figure—nine percent of the workday—or what evidence in the record supports this calculation." (citation omitted)), *report and recommendation adopted*, 2020 WL 3799344 (E.D.N.C. July 7, 2020).

Judge Shelton also did not appear to acknowledge or account for the alleged unpredictable and urgent nature of Melanie's stated bathroom needs. The ALJ's discussion of the record evidence and Melanie's subjective statements did not address this reported symptom, and it is not obvious how one fifteen-minute break every two hours is responsive to the bathroom "emergenc[ies]" Melanie testified about. (*See* AR at 73; Pl. Br. at 16.) "Typically, RFC determinations considering the limitations resulting from Crohn's disease and IBS use phrases that stress the urgency of the claimant's need to use a restroom. This is because . . . it is reasonable that a person with Crohn's disease does not decide when to go to the bathroom." *David S.*, 2025 WL 2709407, at *8 (omissions in original) (quoting *Jeff D. v. Saul*, No. 19-233, 2021 WL 2336951, at *3 (E.D. Wash.

June 8, 2021)); *see Jeff D.*, 2021 WL 2336951, at *3 (collecting cases in which RFC limitations required "close proximity to a bathroom," "ready access to a restroom," and the like).[13]

"If the ALJ determined that the limitation[s]" claimed by Melanie were "supported only to the extent that Plaintiff required [one fifteen-minute break every two hours], as expressed in the RFC determination, then she should have said so and explained why." *Benjamin G.*, 2026 WL 526384, at *13 (cleaned up). While the ALJ is entitled to broad deference in her assessment of the credibility of a claimant's testimony and the persuasiveness of the medical sources, such assessments must still be supported by substantial evidence in the record and an explanation of the reasons for the ALJ's conclusions. *See Reefer*, 326 F.3d at 379–82 (remanding where ALJ failed to adequately consider plaintiff's subjective statements and failed to adequately explain why he credited some evidence and discredited other evidence); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." (citation omitted)); *David S.*, 2025 WL 2709407, at *3 ("Remand is appropriate . . . if the ALJ's findings are not the product of a complete review which 'explicitly weigh[s] all relevant, probative and available evidence' in the record.").[14]

---

[13] The Commissioner contends that Judge Shelton "reasonably accommodated [Melanie's] gastrointestinal symptoms" not only by including break time in the RFC but also by "limiting [Melanie] to sedentary work." (Opp. at 5.) It is far from clear that limiting an individual to sedentary work accommodates or accounts for her stated frequent, unpredictable bathroom needs. (*See* Reply at 7.) It is also not clear that the ALJ viewed the sedentary work limitation (as opposed to just the break time requirement) as Crohn's-related, and the Court cannot accept the Commissioner's *post hoc* explanation of the ALJ's findings. *See Williams v. Comm'r of Soc. Sec.*, No. 18-13465, 2019 WL 4574502, at *3 (D.N.J. Sept. 20, 2019) (citing *Stockett v. Comm'r of Soc. Sec.*, 216 F. Supp. 3d 440, 456 (D.N.J. 2016)).

[14] What is more, although Judge Shelton evidently intended to credit Melanie's "allegations regarding episodes of diarrhea" to some extent by including a bathroom break limitation in the RFC, it is not clear the

Based on the testimony from the VE, this error was not harmless. The VE testified that an individual with Melanie's RFC who needed a fifteen-minute break every two hours could perform work within the national economy but that no jobs exist for an individual who would be off-task more than 15% of the workday or who requires on-demand access to a bathroom at unpredictable intervals. (AR at 88–89; *see also id.* at 90 (ALJ stating that an individual is "not going to be working . . . when they're in the bathroom").) Per the VE, such limitations "preclude[] all work in the competitive labor market." (*Id.* at 88.) Where, as here, a VE testified that additional off-task time would preclude the plaintiff from acquiring employment, an ALJ's insufficient analysis of off-task time or bathroom break needs constitutes harmful error requiring remand. *See Cosnyka*, 576 F. App'x at 46 ("Because there is no substantial evidence for the ALJ's six-minutes per hour formulation, and this formulation was crucial to the vocational expert's conclusion that there were jobs [Plaintiff] could perform, we cannot uphold the ALJ's decision to reject [Plaintiff's] claim for benefits."); *David S.*, 2025 WL 2709407, at *8 ("The ALJ's failure to address any functional limitations flowing from Plaintiff's Crohn's disease takes on greater significance when one

---

existing formulation even accomplishes that much. It appears that, as Judge Shelton herself acknowledged, a fifteen-minute break every two hours is "standard," rather than a meaningful RFC limitation. (AR at 46 (setting forth Melanie's RFC, including that she can "work for two hours before needing a *standard* fifteen minute break" (emphasis added)), 88 (posing matching RFC hypothetical to VE during hearing, including "working 2 hours before getting a *standard* 15-minute break" (emphasis added))); *see David S.*, 2025 WL 2709407, at *8 (finding that identical RFC determination, which limited plaintiff to "work[ing] for 2 hours before needing a standard 15-minute break," contained "no accommodation for limitations flowing from Plaintiff's Crohn's disease, such as additional bathroom breaks, time off task, or absences from work"); *Samantha C. v. Kijakazi*, No. 21-4008, 2022 WL 4636161, at *9 & n.42 (N.D. Iowa Sept. 30, 2022) ("Normal work allows for breaks every two hours, usually for fifteen minutes (unless the lunch break)." (collecting cases)). Judge Shelton did not explain this discrepancy and seemingly did not intend it. Even if intended, the ALJ's decision does not support a finding of no need for breaks or off-task time. *See, e.g.*, *Martin v. Comm'r of Soc. Sec.*, No. 21-5, 2022 WL 486894, at *4 (W.D. Pa. Feb. 17, 2022) (concluding that, although ALJ adequately explained why the record did not support the full extent of plaintiff's claimed bathroom needs, the ALJ had not justified or explained "why she ultimately went to the other extreme and found, in essence, that Plaintiff had no need for unscheduled restroom trips or proximity to a bathroom"). Such an error likewise requires remand.

considers that the vocational expert testified that employers tolerate an employee being off task up to 15% of the day, but anything more than that would eliminate work . . . ."); *Nixon v. Colvin*, No. 15-2395, 2016 WL 1532197, at *12 (D.N.J. Apr. 15, 2016) ("[T]he ALJ's error in this case is not harmless, because had he considered Plaintiff's incontinence, the ALJ may have found that Plaintiff could not have performed her past work[,] . . . that her condition required her to take frequent breaks[,] . . . and . . . that a limitation of Plaintiff's ability to work without breaks could render her incapable of performing her past work as a clerk and any work available in the national economy."); *see also Williams v. Comm'r of Soc. Sec.*, No. 18-13465, 2019 WL 4574502, at *3 (D.N.J. Sept. 20, 2019); *Jeffrey B. v. Saul*, No. 20-1090, 2021 WL 797920, at *3 (D. Md. Mar. 2, 2021); *McNeely*, 2020 WL 5648214, at *8.

2. Reported Bathroom Break Needs

Relatedly, Judge Shelton did not sufficiently explain or support her threshold determination that the greater bathroom needs alleged by Melanie were not fully credible. In reviewing the medical evidence pertaining to Melanie's gastrointestinal impairments, Judge Shelton emphasized what she described as "relatively normal" physical examination findings of "a non-tender abdomen and soft, positive bowel sounds" at multiple appointments, as well as Melanie's imaging results of an October 2022 MRI that "did not indicate evidence of bowel obstruction or abnormal bowel thickening or enhancement" and "did not reveal significant inflammation in her bowel" and a September 2023 colonoscopy that "found no evidence of active idiopathic inflammatory bowel disease." (AR at 49–50 (citing AR at 696, 705, 709, 713, 1122, 1342, 1381–88, 1500–22, 1545, 1548); *see also* Opp. at 5.) Judge Shelton then summarized her reasoning and her assessment of the evidence by stating that "the above residual functional capacity assessment . . . is supported by evidence that the claimant's gastrointestinal disorder is controlled with medication management

and her history of conservative treatment during the period at issue." (AR at 50; *see also* Opp. at 5.) As mentioned, although Judge Shelton credited Melanie's "allegations regarding episodes of diarrhea" in finding "the need" for an RFC limitation regarding break time, she did not correspondingly credit Melanie's assertions that such episodes occur unpredictably, as often as 25 times a day on bad days, for several days at a time. (AR at 50; *see id.* at 47.)

However, "neither the ALJ nor the Commissioner explain why normal abdominal examinations" and imaging showing no bowel obstruction, significant bowel inflammation, or abnormal bowel thickening "would undercut Plaintiff's reported symptoms regarding the urgency, frequency, and duration of her bowel movements. It is not obvious to the Court, nor is it explained in the record, why such medical evidence is somehow inconsistent with Plaintiff's reported bathroom usage." *C.P. v. O'Malley*, No. 23-278, 2024 WL 757087, at *5 (D. Colo. Feb. 23, 2024); *see also* SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017) ("Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques."). It is also not clear to the Court that Melanie's treatment may be appropriately characterized as "conservative" and her impairments described as "controlled with medication management." (AR at 50.) Melanie's treatment for Crohn's disease included the partial removal of her lower colon prior to the relevant period, injectable Humira every two weeks since 2017 and throughout the relevant period, and ongoing treatment by gastroenterologists for ongoing complaints of, *inter alia*, diarrhea, related rectal bleeding, and abdominal pain. (*See, e.g.*, *id.* at 623, 1073, 1340–42, 1380, 1500–03, 1506–07, 1510, 1514, 1551.) Judge Shelton's discussion of the record evidence did not address much of that treatment, instead focusing on the above-mentioned physical examination and imaging findings, such that the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see Benjamin G.*, 2026 WL 526384, at *14 ("Though

the ALJ was not required to credit Plaintiff's testimony on this point, she at least had to weigh it along with the other record evidence and, if she did not find it credible, explain why. In the absence of such explanation, the Court cannot tell if the ALJ here simply ignored the full context of Plaintiff's testimony." (citation omitted)).

Further, it does not appear that any medical records or opinions describe Melanie's treatment as "conservative" or her impairments as "controlled," and that characterization is not obvious from the evidence itself. *See Morales v. Comm'r of Soc. Sec.*, No. 18-996, 2019 WL 2642649, at *6 (D.N.J. June 27, 2019) (finding that ALJ "improperly determined that Plaintiff's symptoms were 'controlled' while on medication" where records did not characterize claimant's symptoms and medication management that way and where "'control' still resulted in three to four instances of diarrhea per day for several days a week"); *Benjamin G.*, 2026 WL 526384, at *14 ("[T]o the extent the ALJ alleges that Plaintiff's [Crohn's] symptoms had stabilized since he began a course of Remicade infusions, this finding ignores the fact that Plaintiff nonetheless had to seek emergency treatment notwithstanding the infusions[,] . . . continued to exhibit symptoms of his Crohn's disease[,] . . . [and] suffered from weight loss, anal fissures, and abdominal pain and vomiting not requiring emergency treatment." (citations omitted)); *Hennion v. Colvin*, No. 13-268, 2015 WL 877784, at *21–22 (M.D. Pa. Mar. 2, 2015) (explaining that an ALJ's "lay opinion . . . does not provide substantial evidence" and concluding that "the ALJ was not entitled to independently interpret the medical evidence to conclude that it demonstrated no 'significant' abnormalities" where "no individual with medical training" deemed those records "not 'significant'"). The record appears to suggest the opposite. (*See* AR at 1380 (May 2023 treatment notes musing whether Melanie's Crohn's disease is "not well controlled ?" and stating "[Melanie's] body [is] flaring and is just wondering if [medication for Crohn's disease] is still

working"); *id.* (July 2023 treatment notes stating "Patient does not think that her Crohn's disease is well controlled [on] the current medication"; "continues to have abdominal pain and heartburn as well"; and "going for more GI work up and a colonoscopy soon"); *see also id.* at 1327, 1500.)[15]

"Accordingly, the Court cannot follow the ALJ's reasoning in deciding to give less weight to Plaintiff's reported bathroom limitations" based on the foregoing evidence. *C.P.*, 2024 WL 757087, at *5; *see Gonzalez v. Saul*, No. 17-2524, 2019 WL 13401378, at *17 (D.N.J. Oct. 31, 2019) (finding that ALJ's assessment of plaintiff's subjective symptoms was neither amenable to meaningful judicial review nor supported by substantial evidence where ALJ "excluded Plaintiff's repeated complaints about these symptoms [of frequent, unpredictable bowel movements]"); *Benjamin G.*, 2026 WL 526384, at *14 ("[I]t is not that the [mistake of fact] requires a different finding; rather, the ALJ's basis for his credibility determination on this issue is wrong, and so the ALJ must reconsider the credibility determination in light of the [ignored] evidence." (alterations in original) (quoting *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009))); *Peterson v. Berryhill*, 363 F. Supp. 3d 651, 661–62 (D.S.C. 2019) (holding that ALJ erred in finding the plaintiff "not as limited by the sensation of fecal urgency as he represents himself to be" where ALJ relied on a misstatement or misinterpretation of the record evidence). The Court emphasizes: "By no means is the Court stating that the ALJ was required to simply accept Plaintiff's testimony as to the frequency, duration, and intensity of [her] bowel-related symptoms . . . and the Court expresses no

[15] The Commissioner asserts that "no treating or examining medical source opined that Plaintiff required the kind of excessive or work-preclusive bathroom access she now claims." (Opp. at 5.) Even if true, Judge Shelton nowhere remarked upon such an absence or cited it as part of her reasoning, so the Court may not accept this *post hoc* explanation. *See Stockett*, 216 F. Supp. 3d at 459; *Conley v. Colvin*, No. 15-261, 2016 WL 1255315, at *1 n.1 (W.D. Pa. Mar. 31, 2016) (finding that ALJ properly discounted plaintiff's stated bathroom needs where ALJ specifically found that "[plaintiff's] allegations of frequency of diarrhea are not substantiated by the treatment records," reviewed extensive such records beyond objective findings, and noted inconsistencies in plaintiff's statements). To the contrary, the ALJ found Melanie's stated bathroom needs credible enough to warrant a break limitation as part of the RFC.

opinion as to what the appropriate findings regarding the frequency and duration of Plaintiff's restroom breaks should be." *Martin v. Comm'r of Soc. Sec.*, No. 21-5, 2022 WL 486894, at *4 (W.D. Pa. Feb. 17, 2022). "However, the record contains sufficient evidence relating to this issue to require a more focused and thorough analysis," *id.*, and the ALJ, having "assessed [a] specific off-task limitation, . . . was obligated to explain it," *McNeely*, 2020 WL 5648214, at *10; *see also David S.*, 2025 WL 2709407, at *9 ("[R]emand is appropriate even if, upon further examination of Plaintiff's Crohn's disease and the RFC determination, the ALJ again concludes that Plaintiff is not entitled to benefits. 'On remand, the ALJ may reach the same conclusion, but it must be based on a proper foundation.'" (citation omitted)).

### B. Reported Mental Impairment Symptoms

Melanie similarly argues that Judge Shelton "misstated [her] treatment regimen, which was not conservative in nature," such that the ALJ's associated findings were erroneous and not supported by substantial evidence. (Pl. Br. at 23; *see id.* at 21–27.) The Court agrees.

As part of her RFC assessment, Judge Shelton concluded that Melanie's reported mental impairment symptoms are not as extensive or limiting as alleged. (AR at 47.) Her explanation for this conclusion was that Melanie's stated symptoms are "inconsistent with years of relatively normal mental status examinations and conservative outpatient treatment." (*Id.*; *see id.* at 49–50) However, as explained hereinbelow, it is unsupported to describe Melanie's mental health treatment as simply or primarily "conservative outpatient treatment," and Judge Shelton appears to mischaracterize or misstate several aspects of the record. Such errors undermine the ALJ's analysis and conclusions and accordingly warrant remand. *See Benjamin G.*, 2026 WL 526384, at *13–14; *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008) (reversing and remanding ALJ decision and explaining that a finding based on a factual mistake or

mischaracterization is not supported by substantial evidence); *Cotter*, 642 F.2d at 707 (reversing and remanding ALJ decision where the ALJ "did not consider all the relevant record evidence, and, more significantly, misconstrued the evidence considered"); *DeChamplain v. Bisignano*, 837 F. Supp. 3d 657, 678–79 (M.D. Pa. 2026) ("[T]he ALJ's conclusion that these opinions were not supported by the longitudinal medical record is based upon a vast mischaracterization of the plaintiff's overall treatment records. For example, the ALJ's characterization of the plaintiff's treatment as 'conservative,' and focus on a 'lack of inpatient mental health treatment' understates the overall picture of the plaintiff's treatment . . . ."); *Voorhees v. Colvin*, 215 F. Supp. 3d 358, 384 (M.D. Pa. 2015) ("Substantial evidence does not support the ALJ opinion as the ALJ selectively overemphasized the aspects of Plaintiff's medical records that support a finding of non-disability but failed to appropriately account for evidence that would support a contrary conclusion.").

For starters, Melanie's treatment during the relevant period included not only outpatient treatment but also significant inpatient treatment.[16] Beginning on September 7, 2021, Melanie

[16] The record reflects similarly extensive mental health treatment prior to her onset date, including two psychiatric hospitalizations, residential treatment, and 21 days of a half-day partial hospitalization program in 2017, during which Melanie was treated for bipolar disorder, PTSD, dissociative identity disorder, mood disorder, cocaine and cannabis dependence, trauma-related symptoms, and suicidal thoughts. (AR at 652, 1392–96; *see id.* at 734 ("Multiple hospitalizations for substances and psych. First hospitalized age 15 for eating disorder; started on meds for anxiety, ADHD, depression.")); *DeChamplain*, 837 F. Supp. 3d at 678–79 ("While the plaintiff's hospitalizations and electroconvulsive therapy occurred just prior to the alleged onset date, the ALJ's failure to address these significant treatments which, in our view, are anything but conservative, paints an inaccurate picture of the plaintiff's ongoing mental health struggles.").

Records further reflect that, between the ages of 5 and 11, Melanie was sexually abused by her uncle and by a friend's father. (AR at 732–33, 1394.) She engaged in self-injurious behaviors "on a daily to almost daily basis from age 9-14," including "burning, hitting her head against the wall, and cutting," because she experienced intense dissociation ("she was not sure if she was alive or not") and "knew she was [alive]" when she would "[s]ee blood or feel change." (*Id.* at 733; *see id.* at 739.) Sometime between the ages of 13 and 15, Melanie began abusing drugs, including cocaine multiple times a week while in high school, "regular use of hallucinogens and ecstasy beginning at age 17," daily intravenous heroin use from ages 20 to 37, and past use of opiates, stimulants, benzodiazepines, and alcohol. (*Id.* at 733; *see id.* at 1394; *see also id.* at 831 (treatment record noting that Plaintiff started to abuse alcohol at age 11).) Melanie reported experiencing a "psychotic break" with visual hallucinations when she was 19 years old. (*Id.* at 1129, 1133.) She attempted suicide at least once, at the age of 30. (*Id.* at 1392, 1395; *see also id.* at 732.)

required ten days of inpatient psychiatric treatment followed by an additional month of intensive outpatient partial hospitalization. (AR at 732, 796–97; *see id.* at 620–75, 731–850.) Specifically, on September 7, 2021, Melanie's mother brought her to the emergency room "due to altered mental status, lethargy, slurred speech, and making suicidal statements to her boyfriend." (*Id.* at 652.) Her mother was concerned that Melanie attempted suicide via overdose and reported that her daughter was "increasingly paranoid, perseverating on [having] be[en] raped in May 2021[,] and stating people are out to get her and hack her."[17] (*Id.*; *see also id.* at 732 (treatment record noting that Melanie stated she "had a 36 hour black[] out," "is used to having blackouts due to . . . significant dissociation [but that] this was the longest . . . that she had experienced," "had gone approximately 50 hours with minimal sleep," and "had been manic").) Per her mental status examination at the hospital, Melanie's attire was disheveled, her eye contact was sporadic, and her affect was anxious and depressed. (*Id.* at 667.) She was "Crying/Weeping" and was deemed a danger to herself. (*Id.*)

Melanie was hospitalized for two days at Monmouth Medical Center, then discharged to Carrier Clinic where she received inpatient treatment for "psychiatric decompensation," "severe" depression, and "severe" substance use disorder from September 9 to September 17, 2021. (*Id.* at 651–52, 661, 732; *see id.* at 620–41, 651–75.) Melanie's mental status examination upon admission to Carrier Clinic described her as exhibiting "guarded" and "unpredictable" behavior,

---

[17] Melanie was reportedly "abducted, drugged and raped in late April 2021 to early May 2021." (AR at 732; *see id.* at 652, 669.) She attended a concert with a friend in Florida and reported that "her backpack may have been tampered with at the concert & Roofies placed in it." (*Id.* at 712.) She also reported that during the visit "she felt she was under surveillance" and "every time she left her friend's house she noticed that there were cell phones on the doormat." (*Id.*; *see also id.* at 732 (treatment record stating that Melanie "continues to endorse paranoid ideation, although she states that the fact that she was abducted and hacked has been substantiated by the FBI").) Soon after returning to New Jersey, Melanie hit a pole and totaled her car "in broad daylight" but reported having "no recall of the event." (*Id.* at 712.) She was "urged" to seek counseling "for all of these events in order to [e]nsure that they aren't paranoia." (*Id.*) This reported sexual assault was in addition to the childhood sexual assault she experienced, *see supra* note 16, and a later incident of sexual assault around 2023, (*see* AR at 1129 (noting that Melanie reported that "she was raped last year when someone broke into her apartment . . . during the day")).

"rapid" and "rambling" speech, "disorganized" and "tangential" thought process, poor judgment, and "blunted, incongruent, tense, anxious, depressed, [and] cheerful" affect. (*Id.* at 671 (cleaned up).) She "appear[ed] to have [a] bizarre smile and affect," and she rated her depression and anxiety, respectively, as a seven out of ten and ten out of ten. (*Id.* at 652.)

Melanie was then transferred to Princeton House Behavioral Health, where she received intensive outpatient partial hospitalization treatment from September 20 to October 22, 2021. (*Id.* at 797, 732; *see id.* at 731–850.) For a half day five days a week, Melanie engaged in individual psychotherapy, group therapy, art therapy, and psychiatry for severe anxiety, depression, trauma symptoms, and substance abuse. (*Id.* at 731–850.) Specifically, her diagnoses upon intake included "bipolar disorder, current episode mixed, severe with psychotic features," PTSD, generalized anxiety disorder, dissociative disorder, "cannabis dependence, daily use," "[s]edative, hypnotic or anxiolytic use disorder, severe, dependence," stimulant abuse, "[o]pioid use disorder, severe, in early remission, dependence," "history of cocaine abuse," and "history of hallucinogen abuse."[18] (*Id.* at 740.) It was noted during her intake assessment that Melanie "appeared hypomanic with circumstantial thought process," "report[ed] significant dissociative events in which she does not have memory of what people say she did," and "some paranoid ideation was noted." (*Id.* at 732.) Other mental status examinations throughout her treatment at Princeton House noted, *inter alia*, impaired and limited insight, impulsive reasoning, disheveled appearance, continued hypomania, anxiety, and depression, "Paranoid/Persecutory Delusions," derealization and depersonalization,

[18] While attending Princeton House, Melanie experienced an "increase in DID sxs [i.e., dissociative identity disorder symptoms] and relapse on substances." (AR at 798.) On October 4, 2021, she went to the emergency room for detox treatment after relapsing and abusing prescription medication. (*Id.* at 821–22; *see id.* at 762.) She reported to her therapist that she did not recall starting to use again and was "seeing shadows." (*Id.* at 821.) Thereafter, she continued the Princeton House program for another two-and-a-half weeks until being discharged. (*Id.* at 762–89, 796–821.) Melanie was referred to residential treatment but expressed "feeling trapped" during prior hospitalizations and decided to instead resume outpatient psychotherapy and psychiatry. (*Id.* at 797–99, 1261, 1590.)

and affect that was "not consistently congruent with stated thoughts or mood." (*Id.* at 739–91; *see also id.* at 770 ("tearful with childlike affect at times; at other time adult like").) Melanie's prescription medication regimen upon discharge from Princeton House included the "[a]ntipsychotic and mood stabilizer" Zyprexa (Olanzapine) as well as other psychotropic medications including Librium (Chlordiazepoxide), Prozac (Fluoxetine), Vistaril (Hydroxyzine), and Topamax (Topiramate). (*Id.* at 787–88 (cleaned up).)

Although Judge Shelton acknowledged the foregoing treatment in September and October 2021, she appears to have mischaracterized and minimized it. Judge Shelton stated that Melanie "was treated in the emergency department for substance use disorder on September 7, 2021," then "voluntarily admitted for inpatient substance use treatment following her discharge from the emergency department," and finally "was admitted to a partial hospitalization program to treat her substance use disorder." (*Id.* at 47–48.) However, it appears that Melanie was hospitalized for two days beginning on September 7, 2021, as opposed to just "treated in the emergency department" then discharged to inpatient treatment. Moreover, it is not accurate to characterize Melanie as receiving treatment "for substance use disorder" alone. Various treatment providers in fact appear to characterize this treatment as primarily psychiatric. (*See, e.g.*, *id.* at 652 (Carrier Clinic admission assessment stating that Melanie had been referred for treatment "for psychiatric decompensation"), 661 (Carrier Clinic discharge notes describing Melanie's "primary" diagnosis as "recurrent severe" major depressive disorder), 732 (Princeton House intake assessment stating that Melanie had been referred "for intensive outpatient due to invo[l]untary inpatient psychiatric hospitalization").) Although Melanie's mother was concerned she attempted suicide via overdose and Melanie was certainly treated for severe co-occurring substance use disorders during that period, essential details include that Melanie was brought to the hospital due to a suicide attempt,

hospitalized due to suicidality and being a danger to herself, and subsequently treated for multiple mental illnesses. (*Id.* at 651–52, 661, 667, 740.) Judge Shelton did not mention Melanie's suicide attempt or even indicate that Melanie's hospitalization, inpatient treatment, and intensive outpatient treatment involved treatment for her mental illness symptoms. (*Id.* at 47–48.) In turn, the Court cannot tell whether and to what extent Judge Shelton considered those details of Melanie's treatment. *See Cotter*, 642 F.2d at 705.

The Court further notes that even Melanie's traditionally "outpatient" treatment is not obviously "conservative" in nature, and Judge Shelton fails to adequately explain and support that characterization and her characterization of Melanie's symptoms as "managed with medication." *See Hennion*, 2015 WL 877784, at *25 ("[I]t is questionable whether a reasonable mind could have concluded that Plaintiff's treatment was conservative without basing this conclusion on a medical opinion."); *Morales*, 2019 WL 2642649, at *6 (finding that ALJ's characterization of plaintiff's symptoms as "'controlled' while on medication" was impermissible lay opinion and was contradicted by evidence of persisting symptoms). From August 11, 2017 to September 2, 2021—i.e., for four years, including for the first month of the relevant period—Melanie attended psychotherapy twice a week with Mary-Breen O'Connor, MSW, LCSW, "to improve her level of daily functioning" and "reduce the intensity" of her symptoms resulting from bipolar disorder, PTSD, ADHD, and "[c]ocaine abuse, in remission." (AR at 1523.) She saw a different therapist throughout the relevant period, from October 5, 2023 through at least May 21, 2024, often twice a week. (*Id.* at 1261, 1351; *see id.* at 1706, 1713, 1715, 1717.)

Furthermore, from January 25, 2021 until at least April 26, 2024—i.e., for over three years, including for the entire relevant period—Melanie attended psychiatry appointments one to three times a month. (*Id.* at 1570–1719.) As mentioned, Melanie was taking numerous psychotropic

medications, including an "[a]ntipsychotic and mood stabilizer," as of her discharge from Princeton House in October 2021, (*id.* at 787–88), and she was prescribed different psychotropic medications, including Klonopin and Zoloft, leading up to and following her September–October 2021 intensive treatment, (*id.* at 1587, 1590–1708). In January 2024, her Zoloft prescription was increased from 50 mg to 100 mg daily. (*Id.* at 1709–10.) She continued taking Klonopin, Zoloft, Topamax, and Vistaril at least through the date of the ALJ's hearing. (*Id.* at 1711–19.) Judge Shelton acknowledged that, notwithstanding this treatment, Melanie continued to experience "severe anxiety" as well as "nightmares, episodes of dissociation, anxiety, [and] mood disturbance."[19] (*Id.* at 48.) Notably, Melanie exhibited "depressed mood" during her February 2023 psychiatric consultative examination and "cried throughout the examination." (*Id.*)

Many courts have rejected an ALJ's characterization of similar treatment regimens—including combined psychotropic medications, continuous psychiatric treatment and therapy, and ongoing symptoms despite such treatment—as "conservative," especially where, as here, no medical opinion of record describes the plaintiff's treatment that way. *See Nolasco v. Kijakazi*, No. 21-4119, 2023 WL 2773532, at *11 (E.D. Pa. Apr. 3, 2023) ("Courts within this Circuit have repeatedly rejected characterizations of treatment as 'routine,' 'conservative,' or 'minimal' in cases where the claimant, although not hospitalized, was being treated with a combination of

[19] In December of 2023, Melanie's current therapist, Jarrah Kratzer, LCSW, provided a letter stating that she treats Melanie for "persistent and extremely difficult mental health symptoms resultant of her extensive history of sexual abuse and assault" and that Melanie "reports severe anxiety, mood disturbance, [and] obsessive, intrusive thoughts, feelings and behaviors," "reports experiencing flashbacks, and nightmares almost every night which induce vomiting due to their nature and content," and "experiences episodes of dissociation during which time she is frequently unaware of her thoughts, feelings, and behaviors." (AR at 1261.) In May of 2024, the therapist provided another letter stating that Melanie "describes difficulty with severe anxiety and mood fluctuation," including "heightened" anxiety and depression symptoms, and "continues to report experiencing flashbacks, nightmares and dissociative episodes," including "an increase in flashbacks and nightmares with her history of sexual assault being the ongoing theme of both." (*Id.* at 1351.) The therapist did not describe Melanie's symptoms as managed or controlled.

psychotropic medications and psychotherapy." (collecting cases)); *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("In light of the extensive treatment [Plaintiff] received for her various conditions, the ALJ's designation of [Plaintiff's] course of treatment as 'conservative' amounts to improperly 'playing doctor' in contravention of the requirements of applicable regulations."); *Za Xiong Moua v. Saul*, No. 19-516, 2020 WL 5257592, at *8 (E.D. Cal. Sept. 3, 2020) ("[T]he ALJ did not adequately explain why Plaintiff's treatment—which included consistent courses of psychiatric medications including antipsychotics and antidepressants, and frequent mental health visits . . . with professionals—was 'conservative' . . . ." (citation omitted) (collecting cases)); *see also Rivera v. Comm'r of Soc. Sec.*, No. 19-4630, 2020 WL 8167136, at *15 n.14 (S.D.N.Y. Dec. 30, 2020) ("The term 'conservative' is perhaps susceptible to differing interpretations. Many courts have resisted the overuse of that term to describe any and all mental health regimens short of psychiatric hospitalization." (cleaned up) (collecting cases)), *report and recommendation adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021). "The Court is not suggesting that the record conclusively demonstrates that Plaintiff's treatment history has not been 'conservative,' or that such a distinction is outcome determinative." *Davis v. Comm'r of Soc. Sec.*, No. 19-1431, 2020 WL 5701921, at *5 (W.D. Pa. Sept. 24, 2020). "However, merely labeling [Plaintiff's] treatment history as conservative while failing to acknowledge" seemingly probative aspects of her treatment history[20] "is not enough to convince the Court that the ALJ's decision . . . was sufficiently supported by the record." *Id.*

[20] In addition to the aspects of Melanie's treatment history discussed above, the Court notes that Judge Shelton referred to Melanie's "medication management" for her mental health symptoms in general terms, without mention of any of the specific psychotropic medications Melanie was taking. (AR at 48–49); *cf. Davis*, 2020 WL 5701921, at *4 (noting that, "in characterizing Plaintiff's treatment history and the objective observations, the ALJ did not discuss that Plaintiff had been prescribed and had used lithium and Seroquel for her bipolar I condition" and that courts have recognized that the use of such medications "is generally inconsistent with a finding of conservative mental health treatment").

The record also does not appear to support the representation that Melanie had "years of relatively normal mental status examinations," and Judge Shelton did not reconcile that characterization with the record evidence to the contrary, including the evidence she described. (AR at 47–50.) The Court notes, for example, that Judge Shelton described Melanie's "mental status examination performed in connection with her admission to the partial hospitalization program" (Princeton House) as "relatively normal, other than an anxious mood, impulsive reasoning, and impaired insight." (*Id.* at 48 (citing AR at 739).) The ALJ did not sufficiently explain or support why she considered this mental status examination to be ultimately "relatively normal" given that, as she noted, Melanie was being admitted to an intensive partial hospitalization program and exhibited "anxious mood, impulsive reasoning, and impaired insight." (*Id.*) Further, although the cited page includes multiple notations of "normal," other pages of the same intake assessment reflect significant symptoms. (*See id.* at 732 ("On evaluation today, patient appeared hypomanic with circumstantial thought process. Thought content was generally normal although some paranoid ideation was noted . . . ."), 733 (listing psychiatric symptoms such as "Manic/Hypomanic Symptoms: Mood/Lability; Pressured Speech; Impulsivity/Reckless Behavior; Racing Thoughts," "PTSD Symptoms: Dissociation; Intrusive Memories; Nightmares," and "Psychosis: Paranoid Thoughts"), 740 (listing diagnoses, including "bipolar disorder, current episode mixed, severe with psychotic features"), 741 (certifying that "the patient would require inpatient psychiatric care if the Partial Hospitalization services were not provided").)

ALJs are not expected "to make reference to every relevant treatment note," but they must explain their "reason[s] for rejecting or not addressing relevant probative evidence." *Fargnoli,* 247 F.3d at 42; *see id.* at 43–44 ("The ALJ makes no mention of any of these significant contradictory findings, leaving [the court] to wonder whether [s]he considered and rejected them, considered

and discounted them, or failed to consider them at all. The ALJ's failure to explain [her] implicit rejection of this evidence or even to acknowledge its presence was error. [The court] therefore cannot conclude that [the ALJ's] findings at step four were supported by substantial evidence." (cleaned up)); *Morales*, 2019 WL 2642649, at *7 ("Remand is appropriate where . . . relevant and probative evidence was not explicitly and accurately weighed in arriving at a decision on the plaintiff's claim for disability benefits." (omission in original)); *Gleason v. Colvin*, 152 F. Supp. 3d 364, 382 (M.D. Pa. 2015) ("This selective quoting amounted to error as the ALJ was required to provide some explanation for a rejection of probative evidence which would suggest a contrary disposition."); *Benjamin G.*, 2026 WL 526384, at *13 ("Though this Court, sitting in review, owes significant deference to an ALJ's findings of fact, ultimately the ALJ improperly cherry-picked and otherwise mischaracterized most of this evidence." (citation omitted)).[21]

Because Judge Shelton's conclusion that Melanie's mental health symptoms were not as limiting as alleged was expressly based on her finding of "years of relatively normal mental status examinations and conservative outpatient treatment," the foregoing errors are not harmless. (AR

---

[21] Judge Shelton similarly referenced Melanie's "unremarkable mental status examinations" at Step Three, specifically stating that "years of unremarkable mental status examinations did not identify the presence of hallucinations, delusions, or suicidal ideation." (AR at 46 (finding Melanie mildly limited in the functional area of "adapting or managing oneself" based on, *inter alia*, such mental status examinations).) As explained, however, evidence during the relevant period reflects all three. (*See id.* at 652 (providing that Melanie's mother brought her to the emergency room for a suspected suicide attempt and said her daughter was "increasingly paranoid"), 667 (finding Melanie a danger to herself), 672 ("Active Delusions: Yes"), 712 (describing Melanie's seeming delusions about events in Florida and stating that Melanie was "urged" to seek counseling "for all of these events in order to [e]nsure that they aren't paranoia"), 732 (stating that Melanie "continues to endorse paranoid ideation"), 756 (noting "Paranoid/Persecutory Delusions"), 768–69 ("[Melanie] [r]eports dissociating; is having auditory hallucinations that are muffled at night. States they are inside her head . . . . Reports auditory hallucinations are louder and she is feeling more paranoid on olanzapine."), 807 ("[Melanie] reported that her TV continues to turn on on its own."), 821 (stating that Melanie reported "seeing shadows"), 1133 (February 2023 consultative examination noting that Melanie "[c]omplains of . . . auditory hallucinations" and "used to have visual hallucinations in the past when she felt she was hitting people with her car").) To the extent Judge Shelton found such evidence non-representative, she was required to explain and support that finding. *See Cotter*, 642 F.2d at 705.

at 47); *see, e.g.*, *Cotter*, 642 F.2d at 707; *Za Xiong Moua*, 2020 WL 5257592, at *10. Moreover, because Judge Shelton likewise cited Melanie's "years of relatively normal mental status examinations" and "conservative outpatient treatment" as the basis for her conclusion that the opinion of Melanie's former therapist was unpersuasive, remanded is warranted with respect to that determination as well. (AR at 49); *see Benjamin G.*, 2026 WL 526384, at *13–14.[22]

*  *  *

Accordingly, for the three related reasons set forth above, each of which is independently sufficient to justify remand, the Court is constrained to remand this case to the Commissioner for further proceedings. The Court expresses no opinion as to whether Melanie is disabled under the relevant regulations or whether Judge Shelton's findings regarding Melanie's other impairments and capacity for sedentary work are supported by substantial evidence. *Boone*, 353 F.3d at 211 n.19; *Jeffrey B.*, 2021 WL 797920, at *4. On remand, the ALJ should properly support her RFC assessment consistent with this Opinion, including by developing the record as needed to substantiate any future off-task time finding with corroborative medical evidence and by inquiring—if the VE's subject matter expertise and available, reliable data allow it—about the possibility of remote work options to accommodate Melanie's symptoms.

[22] Melanie raises additional arguments of error, including that Judge Shelton misstated and overstated her daily activities. (Pl. Br. at 29. *Compare* AR at 47 (stating that Melanie "acknowledged her ability to care for her pet bird, regularly hike, and practice yoga daily" and "acknowledged her ability to shop in stores and drive a car"), *with id.* at 371–74 (Melanie stating that she "used to" hike and do yoga daily, needs accompaniment while driving "for support for anxiety," goes shopping "with help," and "can feed [her pet bird] and clean a little" but her "fiancé takes great care of [the bird]")); *see also Mary H. v. Comm'r of Soc. Sec.*, No. 20-15422, 2022 WL 1304812, at *8 n.3 (D.N.J. May 2, 2022). Melanie also argues Judge Shelton "fail[ed] to properly address the consistency factor" when evaluating her former therapist's opinion, thus rendering the ALJ's unpersuasiveness conclusion erroneous. (Pl. Br. at 45; *see id.* at 32–45.) Having already "f[ou]nd[] a sufficient basis for remand," including with respect to Judge Shelton's assessment of Melanie's former therapist's opinion, the Court declines to address these arguments. *Freeman v. Berryhill*, No. 17-1071, 2019 WL 2540650, at *8 n.6 (M.D. Pa. June 20, 2019) ("[D]istrict courts in the Third Circuit have regularly declined to address outstanding arguments raised by plaintiffs in Social Security appeal cases upon finding a sufficient basis for remand, often because of the notion that remanding the case may produce different results that would render those arguments moot." (collecting cases)); *Boone*, 353 F.3d at 211 n.19.

## CONCLUSION

Having reviewed the record as a whole, the Commissioner's decision is **VACATED**, and this case is **REMANDED** for further proceedings. An appropriate Order follows.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: October 31, 2026